```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED:   8/20/2015          │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

HRA GROUP HOLDINGS LTD., et ano,    :     **REPORT AND**

                                      **RECOMMENDATION**

                  Plaintiffs,    :     **TO THE HONORABLE**

                                        **LEWIS A. KAPLAN**

        -against-         :

                                       13cv8791-LAK-FM

MARK'S MAJESTIC DIAMONDS    :
INC., et al.,

                          :

                  Defendants.
----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

         In this action, plaintiffs HRA Group Holdings Ltd. ("HRA") and

Crossworks Manufacturing Ltd. ("Crossworks") (together, "Plaintiffs") seek to recover

more than $1.6 million that they allegedly are owed for diamonds that they sold or

consigned to several corporate defendants.  The Plaintiffs have now moved for partial

summary judgment against the corporations on their breach of contract, goods sold and

delivered, and account stated claims.[1]  The Plaintiffs also seek to pierce the veil of the

corporations in order to hold their principal, defendant Mark Natanzon ("Natanzon"),

individually liable for the entire amount owed.  For the reasons set forth below, the

Plaintiffs' motion for partial summary judgment, (ECF No. 17), should be granted in part

and denied in part.

---

[1]     The Plaintiffs have not moved for summary judgment motion with respect to two
other claims in which they seek to recover for the conversion of the diamonds consigned to
M&N.  In both those claims, the Plaintiffs seek punitive damages in addition to the value of the
consigned diamonds.  (See ECF No. 1 ("Complaint") ¶¶ 120-31).

I.      Background[2]

    A.      Parties

        The Plaintiffs are Canadian manufacturers and distributors of "some of the world's . . . finest cut and polished loose diamonds."  (Ariel Decl. ¶ 4).  Beginning in 2010, they sold and consigned diamonds to defendants Mark's Majestic Diamonds Inc. ("MM Diamonds"), A&M Diamonds Inc. ("A&M Diamonds"), M&N Diamonds Inc. ("M&N Diamonds") (collectively, the "Corporate Defendants, and together with Natanzon, the "Defendants").  (See Natanzon Decl. Ex. A (account statement reflecting transactions between the Plaintiffs and Corporate Defendants as early as 2010)).

        Natanzon is the sole owner and president of each of the Corporate Defendants.  (Natanzon Decl. ¶ 1; Ariel Decl. Ex. C ("Natanzon Dep. I") at 43-44).  After initially conducting business with the Plaintiffs exclusively through M&N Diamonds, a trading company in the business of purchasing and selling diamonds and diamond

--------

[2]     The facts set forth in this Report and Recommendation are based upon the Complaint, the sworn declarations of Itay Ariel (ECF No. 20 ("Ariel Decl.")), and Mark Natanzon (ECF No. 29 ("Natanzon Decl.")), and the exhibits annexed thereto.  Unless otherwise noted, the facts are set forth in the light most favorable to the Defendants.

        In their papers, the Plaintiffs castigate the Defendants for having amended the Natanzon Declaration, their Rule 56.1 counterstatement (ECF No. 30), and their Memorandum of Law (ECF No. 31 ("Def.'s Opp.")), several days after their initial opposition papers were filed.  (Cf. ECF Nos. 24-26).  The Plaintiffs also maintain that the changes in Natanzon's factual averments show that he is "capable of precisely the type of fraud" he is alleged to have committed, and that this Court should so conclude.  (See ECF No. 33 ("Hoffman Decl.") ¶ 5).  I have rejected this invitation for two reasons.  First, as set forth in Section II below, the role of the Court is to determine whether there are any material facts in dispute – not to make credibility determinations. Second, the Court expressly allowed the new papers to be substituted for the Defendants' original filings.  (See ECF No. 28).

jewelry, Natanzon later made purchases from the Plaintiffs through the other two Corporate Defendants. (Natanzon Decl. ¶¶ 2, 4-6). According to the Defendants, Natanzon utilized all three corporations so that the Plaintiffs could increase the credit extended to his companies over time. (Id.; Natanzon Dep. I at 45). The Plaintiffs do not dispute the suggestion that this was done at their request. (Id.).

In addition to purchasing diamonds from the Plaintiffs, the Corporate Defendants appear also to have sold diamonds on occasion to the Plaintiffs. (See Natanzon Decl. Ex. D ("Natanzon Dep. II") at 21).

B.    Sales and Consignment Security Agreements

On June 1, 2010, HRA entered into separate Sales and Consignment Security Agreements with A&M Diamonds and M&N Diamonds (Ariel Decl. Exs. E, F), and Crossworks entered into identical agreements with MM Diamonds, A&M Diamonds, and M&N Diamonds (id. Exs. G-I) (collectively, the "Security Agreements"). (See Ariel Decl. ¶ 8; Natanzon Dep. I at 59-64). The parties executed the Security Agreements in anticipation of a series of transactions through which the Plaintiffs would "consign or sell" to the Corporate Defendants diamonds and other "precious and semiprecious jewelry." (Security Agreements § 1; id. Schedule A).

The Security Agreements each provided that the "failure [by a Corporate Defendant] . . . to pay [the Plaintiffs] . . . any amount due in respect of a consignment . . . [or] sale made pursuant to [the] Agreement[s]" would constitute a default. (Security Agreements §§ 7(a), (b)). In the event of such a default, prior to exercising their rights,

3

the Plaintiffs were required to provide "written notice and a period of ten days . . . to cure." (Id. § 8). The Security Agreements further provided that they were to be governed by New York law (id. § 20), and that the party prevailing in any litigation "arising under or relating to th[e] Agreement[s]" would be entitled to recover its reasonable attorneys' fees (id. § 21).

      C.    <u>Unpaid Invoices</u>

The Plaintiffs shipped diamonds worth several million dollars to the Corporate Defendants over the course of their business relationship. (Ariel Decl. ¶ 6). Each shipment of diamonds was accompanied by an invoice. (Id.). Those invoices indicate that between December 8, 2011, and April 27, 2012, HRA shipped diamonds worth $520,109.63 to A&M Diamonds. (Complaint Ex. A). Of that amount, $448,947.88 allegedly remains unpaid. (Ariel Decl. ¶ 10; Complaint ¶ 22). Between June 30, 2011, and March 21, 2013, HRA shipped $649,963.58 worth of diamonds to M&N Diamonds. (Complaint Ex. B). Of that amount, $413,114.45 allegedly remains unpaid. (Ariel Decl. ¶ 11; Complaint ¶ 24). On August 26, 2011, Crossworks shipped diamonds worth $233,814.80 to MM Diamonds. (Complaint Ex. C). Of that amount, $138,517.40 allegedly remains unpaid. (Ariel Decl. ¶ 12; Complaint ¶ 26). Between January 13 and February 12, 2012, Crossworks shipped diamonds worth $314,059.95 to A&M Diamonds. (Complaint Ex. D). Of that amount, $266,854.21 allegedly remains unpaid. (Ariel Decl. ¶ 13; Complaint ¶ 28). Finally, between March 20, 2012, and March 6, 2013, Crossworks shipped diamonds worth $267,238.61 to M&N Diamonds.

(Complaint Ex. E).  Of that amount, $258,271.44 allegedly remains unpaid.  (Ariel Decl.
¶ 14; Complaint ¶ 30).

In addition to these sales, the Plaintiffs also consigned diamonds to M&N
Diamonds.  Specifically, between January 24 and December 13, 2012, the Plaintiffs
shipped diamonds worth $148,511.52 to M&N Diamonds on consignment.  (Ariel Decl.
¶¶ 16-23; id. Ex. J).  M&N Diamonds allegedly has failed to return those diamonds or pay
for them.  (Ariel Decl. ¶ 23; Complaint ¶ 42).

Natanzon contends that he does not recall receiving all of the invoices "due
to all the business that [the Corporate Defendants] did with the [P]laintiffs" (Natanzon
Decl. ¶ 13), and that he objected to the quality of the Plaintiffs' diamonds (Natanzon Dep.
I at 70-73, 76-79, 82), but he has produced no evidence to contradict the Plaintiffs'
assertion that the diamonds corresponding to the invoices alleged to be unpaid were
accepted without objection (see Ariel Decl. ¶¶ 6-7, 15).

On November 13, 2013, the Plaintiffs provided the Corporate Defendants
with a written Notice of Default.  (See Ariel Decl. Ex. K).  In that Notice, the Plaintiffs
stated (through counsel) that the Corporate Defendants owed them $1,525,705.38 for
diamonds sold and delivered and an additional $148,511.52 for consigned diamonds, or a
total of $1,674,216.90.  (Id. at 1-2; see Ariel Decl. ¶ 25; Natanzon Dep. at 83).  Pursuant
to the Security Agreements, the Corporate Defendants had ten days to cure their default.
(Ariel Decl. Ex. K at 6).  Despite the Notice, the Corporate Defendants failed to make any
further payments before this lawsuit was filed.  (Ariel Decl. ¶ 27; Natanzon Dep. at 86).

5

There also is no suggestion that any of the Defendants has made any subsequent payments.

>    D.    Corporate Defendants' Sales and Returns

>    Between June 8, 2010, and August 22, 2013, the Defendants shipped diamonds worth $2,847,450.28 to the Plaintiffs as "sales and returns."[3]  (See Natanzon Decl. ¶ 8; id. Exs. B, C).  In particular, the Corporate Defendants shipped diamonds worth $847,919.56 to the Plaintiffs during the time period covered by the invoices for which the Plaintiffs seek payment (June 30, 2011, to March 21, 2013).  (Id. Ex. B).

II.    Standard of Review

>    Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record.  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if  "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact in dispute is material if it "might affect the outcome of the suit under the governing law."  Id. (quoting Anderson, 477 U.S. at 248).  Whether or not there exists a genuine dispute as to any material fact is for the Court to determine.  Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989).

---

[3]    Natanzon suggests that the value of the shipments may actually have been higher, but that some of his papers were lost when his storage facility in Brighton Beach, Brooklyn, sustained damage during Hurricane Sandy.  (Natanzon Decl. ¶ 8).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).  The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material.  See Beyer v. Cnty. of Nassau, 524 F.3d 160, 164 (2d Cir. 2008).  Assessments of credibility, choosing between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Id. at 55.

The party seeking summary judgment has the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  Once that showing has been made, "the burden shifts to the nonmoving party, which 'must set forth specific facts showing that there is a genuine issue for trial.'"  Charles Atlas, Ltd. v. DC Comics, Inc., 112 F. Supp. 2d 330, 334 (S.D.N.Y. 2000) (quoting Anderson, 477 U.S. at 250).  To defeat a motion for summary judgment, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).  Rather, the nonmoving party must offer "concrete evidence from which a

reasonable juror could return a verdict in his favor."  <u>Anderson</u>, 477 U.S. at 256.

III.    <u>Discussion</u>

     A.    <u>Breach of Contract</u>

        Under New York law, "to prevail on a breach of contract claim . . . a

plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3)

breach by the other party; and (4) damages."  <u>Williams v. Time Warner Inc.</u>, No. 09 Civ.

2962 (RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 6, 2010) (quoting <u>Terwilliger v.

Terwilliger</u>, 206 F.3d 240, 245-46 (2d Cir. 2000)).[4]

        The Plaintiffs contend that they are entitled to summary judgment with

respect to their claim that the Corporate Defendants breached the Security Agreements

because the Corporate Defendants have yet to pay for $1,674,216.90 worth of diamonds

that the Plaintiffs sold or consigned to them.  (ECF No. 18 ("Pls.' Mem.") at 10-11).  The

Corporate Defendants disagree, arguing that even if the Plaintiffs' invoices are correct,

the Plaintiffs have failed to proffer any evidence that the Corporate Defendants' accounts

were credited for the $2,847,450.28 worth of diamonds that they shipped to the Plaintiffs

as either sales or returns between June 8, 2010, and August 22, 2013.  (Defs.' Opp. at 4-5;

id. at 4 n.3).  In their view, the Plaintiffs therefore have failed to demonstrate the absence

---

      [4]    Each Security Agreement contains a choice of law provision stating that New
York law governs the contract.  (<u>See</u> Security Agreements § 20).  Moreover, both parties agree
that New York law applies to the claims in this action.  (See Pls.' Mem. (citing federal decisions
applying New York law throughout); Defs.' Opp. (same)).

of a genuine dispute as to whether there is an "unpaid balance[] . . . , much less [its] true

amount[]."  (Id. at 6).

        In support of their argument, the Defendants cite two cases.  In <u>Chen v.</u>

<u>New Trend Apparel, Inc.</u>, 8 F. Supp. 3d 406, 461 (S.D.N.Y. 2014), the plaintiffs claimed

that the defendants failed to pay for goods shipped to them over the course of two years,

thereby breaching their contractual undertakings.  <u>Id.</u>  The defendants countered that the

plaintiffs' accounting did not consider an advance payment and challenged the accuracy

of the plaintiffs' calculations.  <u>Id.</u>  They consequently were able to avert summary

judgment because they had cited specific evidence, including sworn affidavits and

declarations, supporting their contention that the amount in dispute was inflated and had

been paid.  <u>Id.</u> at 423-25, 461.  Similarly, in <u>Kasper Global Collection & Brokers, Inc. v.</u>

<u>Global Cabinets & Furniture Mfrs. Inc.</u>, 952 F. Supp. 2d 542, 572 (S.D.N.Y. 2013), the

court denied the plaintiff's motion for summary judgment after the defendants adduced

sworn affidavits and other evidence lending credence to their assertion that the invoices in

question had been fully paid.  <u>Id.</u>

        Rather than challenging the Plaintiffs' accounting through admissible

evidence as in Chen and Kasper, however, the Corporate Defendants here merely suggest

that the balance that the Plaintiffs say is outstanding <u>may</u> be incorrect.  (<u>See</u> Defs.' Opp.

at 4 n.4 ("[T]he [P]laintiffs should be required to account for all of the [Corporate

D]efendants' credits, and prove the existence and correct amount of any outstanding

balances."); Natanzon Decl. ¶ 10 ("I am . . . not presently able to say with any degree of

certainty who owes what to whom in this case."); Natanzon Dep. at 74 ("Q: Do you agree with [the default notice]. A: I'm not sure. I don't know because I never checked them. I never calculated them. They send me merchandise and I sell it to them merchandise and I don't keep the balance exactly"); id. at 76 ("I don't know if they cut whatever I send . . . them back, merchandise, from the bill, from consignment.")). These vague assertions stand in stark contrast to the specific evidence presented by the defendants in Chen and Kasper. Consequently, in the absence of any sworn statement or other evidence supporting the Corporate Defendants' conjecture, there is no material factual issue with respect to the Corporate Defendants' outstanding indebtedness.

      B.    Account Stated

           The Corporate Defendants' liability for most of the amount sought by the Plaintiffs would be equally clear on an account stated theory of liability. (See Complaint ¶¶ 94-119; Pls.' Mem. at 13-16).[5] In order to prevail on such claims, a plaintiff must show that: "(1) an account was presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated." Kasper, 952 F. Supp. 2d at 570 (quoting IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)).

---

     [5]     The Plaintiffs' account stated claims exclude the $148,511.52 worth of diamonds that the Plaintiffs consigned to M&N Diamonds. (Compare Complaint ¶¶ 48-74 (breach of contract claims), with Complaint ¶¶ 94-119 (account stated claims)). Although there are invoices reflecting the diamonds consigned to the Corporate Defendants, (see Ariel Decl. Ex. J), the Plaintiffs apparently have not incorporated these invoices into the account stated claims because the diamonds were not sold. Accordingly, because the Plaintiffs' breach of contract claims include all of the diamonds for which payment remains outstanding, I addressed those claims first.

Here, the Plaintiffs have presented evidence that accounts were stated for transactions involving $1,525,705.38 worth of diamonds that they sold to the Corporate Defendants. (See Ariel Decl. ¶¶ 6, 38-42; Complaint Exs. A-E). Natanzon acknowledges receiving the Plaintiffs' invoices, although he claims not to remember receiving each such invoice. (Natanzon Dep. I at 67-70). Moreover, he raises only a vague, unsubstantiated suggestion that he had objected to "some" of the invoices. (Id. at 70-73). This is not enough to defeat an account stated claim. See Kasper, 952 F. Supp. 2d at 570 ("The second and third elements of account stated may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time.") (quoting IMG Fragrance Brands, 679 F. Supp. 2d at 411) (internal quotation marks omitted); White Diamond Co. v. Castco, Inc., 436 F. Supp. 2d 615, 624 (S.D.N.Y. 2006) ("Unsubstantiated claims of oral objections do not create a material issue of fact, and are insufficient to defeat summary judgment in favor of [Plaintiff]" on an account stated claim).

C.    Setoff and Recoupment

Even if the Defendants had adduced evidence sufficient to raise a factual issue, it would merely relate to a claim for setoff or recoupment of damages. Although such claims are generally interposed as counterclaims, see Eng-Hatcher v. Sprint Nextel Corp., No. 07 Civ. 7350 (BSJ) (KNF), 2008 WL 4865194, at *1 n.1 (S.D.N.Y. Oct. 31, 2008), in this case the Corporate Defendants, at best, have done so by means of an affirmative defense. (See ECF No. 8 ("Answer") ¶ 134 (Third Affirmative Defense)

("The relief demanded in the Complaint is barred, in whole or in part, because [the

P]laintiffs failed to properly allocate [the Corporate D]efendants' payments, or to give

[the Corporate D]efendants full credit for returned goods.")).

There are subtle differences between claims for setoff and recoupment.

"The right of setoff . . . allows entities that owe each other money to apply their mutual

debts against each other, thereby avoiding the absurdity of making A pay B when B owes

A." Ferguson v. Lion Holdings, Inc., 312 F. Supp. 2d 484, 503 (S.D.N.Y. 2004) (quoting

In re Malinowski, 156 F.3d 131, 133 (2d Cir. 1998)).  The right of setoff only applies,

however, when the parties' "mutual debts arise from different transactions."  In re

Malinowski, 156 F.3d at 133.  In recoupment, by comparison, the claims must "arise out

of the same transaction or set of transactions."  Id.  Thus, both doctrines "provide a legal

ground upon which a party can postpone paying a sum to another party until the net

liability between the parties is finally determined."  Ferguson, 312 F. Supp. 2d at 503.

Although the applicability of a particular doctrine may not always be clear,

see id. at 503, the key point is that both place the burden of proof on the party advancing

the claim.  See Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d

379, 398-99 (S.D.N.Y. 2014).  Accordingly, if the Third Affirmative Defense is treated as

the assertion of a defense of set off or recoupment, it necessarily fails because the

Corporate Defendants have done nothing more than speculate that the Plaintiffs'

calculation of the net sum owed may be wrong.  Alternatively, if this defense is treated as

a counterclaim, it still would not preclude the entry of partial summary judgment against

12

the Corporate Defendants, who presumably would remain free to attempt to prove at a later stage of this case that the Plaintiffs' recovery should be offset by some amount that the Plaintiffs owe to them.  See Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc., 721 F. Supp. 2d 194, 203 (S.D.N.Y. 2010) (defendant's potential entitlement to offset "does not preclude the entry of summary judgment against [defendant] for the undisputed amount it owes plaintiff") (collecting cases); Electro-Catheter Corp. v. Surgical Specialties Instrument Co., 587 F. Supp. 1446, 1456-57 (D.N.J. 1984) (plaintiff granted summary judgment on breach of contract claim despite assertion that defendant is entitled to offset).

      D.    Attorneys' Fees

Regardless of the theory upon which damages are awarded, the Plaintiffs are also entitled to reimbursement of their expenses associated with this lawsuit.  Section 21 of each of the Security Agreements provides that the prevailing party "in any litigation . . . between the parties may recover from the other party its reasonable attorneys' fees and costs."  (Security Agreements § 21).  Accordingly, if Your Honor awards the damages that the Plaintiffs seek for the unpaid value of diamonds sold and consigned pursuant to the Security Agreements, the Plaintiffs, as prevailing parties, should also be awarded their reasonable fees and costs.  See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175-76 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear.").

E.   Piercing the Corporate Veil

Finally, the Plaintiffs seek to hold Natanzon jointly and severally liable for the Corporate Defendants' obligations on an alter ego theory.

Under New York law, "[t]he concept of piercing the corporate veil is a limitation on the accepted principle that a corporation exists independently of its owners, as a separate legal entity." Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC, No. 11 Civ. 3238 (ALC) (GWG), 2014 WL 988569, at *7 (S.D.N.Y. Mar. 13, 2014) (quoting Matter of Morris v. N.Y.S. Dep't of Taxation and Fin., 82 N.Y.2d 135, 140 (1993)).  Indeed, the "New York courts are reluctant to disregard the corporate form, and will do so only when it 'has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.'"  Allison v. Close-Ette Too, LLC, No. 14 Civ. 1618 (LAK) (JCF), 2014 WL 4996358, at *5 (S.D.N.Y. Sept. 15, 2014), report and rec. adopted, 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 18 (2d Cir. 1996)) (ellipsis in original; certain internal quotation marks omitted).

In the absence of any express allegation of fraud, a party seeking to recover against the owner of a corporation on a veil piercing theory must show that:  "(1) the owner exercised complete domination over the corporation with respect to the transaction at issue, and (2) such domination was used to commit a . . . wrong that injured the party

seeking to pierce the veil." Carlone v. Lion & the Bull Films, Inc., 861 F. Supp. 2d 312, 319-20 (S.D.N.Y. 2012) (quoting MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001)).  Whether there is a basis to pierce the corporate veil is a decision that must be made by a trier of fact, unless "there are no genuine issues of material fact and the record requires the conclusion that the movant is entitled to judgment as a matter of law."  Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd., 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (Kaplan, J.) (emphasis in original).

Turning to the issue of domination, it is readily apparent that Natanzon exercised complete control over the Corporate Defendants.  Indeed, the Defendants appear to concede this point.  (See Defs.' Opp. at 8 ("Here, although it has been shown that Natanzon was in control of his corporations, no fraud has been established as [a] matter of law.").  Even if this concession had not been made, there clearly would be an abundance of undisputed evidence that Natanzon completely dominated the Corporate Defendants.

Among the factors that courts consider with respect to the issue of domination are:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address

and telephone numbers of corporate entities, (6) the amount of
business discretion displayed by the allegedly dominated
corporation, (7) whether the related corporations deal with the
dominated corporation at arms length, (8) whether the
corporations are treated as independent profit centers, (9) the
payment or guarantee of debts of the dominated corporation
by other corporations in the group, and (10) whether the
corporation in question had property that was used by other of
the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d

Cir. 1991).

In this case, Natanzon was the sole owner, director, and officer of each of

the Corporate Defendants (Natanzon Decl. ¶¶ 1, 15(B)), and has admitted to controlling

them and their bank accounts, (id. ¶ 15(C); Natanzon Dep. at 80).  Further, although each

of the Corporate Defendants complied with certain minimal corporate formalities – such

as executing resolutions electing Natanzon as sole director and officer and waiving notice

of an annual directors meeting (see Natanzon Decl. ¶15(B)) – there is no evidence of any

shareholder or director meetings, or other corporate actions, that would suggest the

Corporate Defendants exercised independent business discretion.  See Bogosian v. All

Am. Concessions, No. 06-CV-1633 (RRM) (RML), 2011 WL 4460362, at *6-7

(E.D.N.Y. Sept. 26, 2011).

Natanzon also has acknowledged that MM Diamonds and A&M Diamonds

never conducted any real business.  (Natanzon Decl. ¶¶ 5-6, 15(A); Natanzon Dep. at 44-

45).  Instead, both companies were used as "purchasers and consignees" simply so that

the Plaintiffs could increase the credit that they extended to M&N Diamonds.  (Natanzon

16

Decl. ¶ 6).  Even if the Plaintiffs were aware that MM Diamonds and A&M Diamonds were only being used for this purpose, as the Defendants contend (Natanzon Decl. ¶ 5-6, 15(A); Defs.' Opp. at 2-3), it is undisputed that all three corporations were undercapitalized, with only M&N having access to a bank line of credit.  (Natanzon Dep. at 52-53); see Tycoons Worldwide Grp., 721 F. Supp. 2d at 206-07 (corporation operating without equity and relying solely on a line of credit likely undercapitalized).  In fact, despite the use of additional entities, all of the payments and shipments to the Plaintiffs were made exclusively through M&N Diamonds.  (See Natanzon Decl. Ex. B).

It also is undisputed that Natanzon consistently withdrew funds from the M&N Diamonds bank account to fund his personal expenses.  (Natanzon Decl. ¶ 15(C); Natanzon Dep. at 52).  He made these withdrawals on an as needed basis rather than paying himself a salary.  (Natanzon Decl. ¶ 15(C)).

In short, Natanzon was in complete control of each of the three Corporate Defendants during the period that they had business dealings with the Plaintiffs.  See Merino v. Beverage Plus Am. Corp., No. 10 Civ. 706 (JSR) (RLE), 2011 WL 3739030, at *6 (S.D.N.Y. Apr. 12, 2011), report and rec. adopted, 2011 WL 3734241 (S.D.N.Y. Aug. 23, 2011) (veil pierced where indicia of domination included  severe undercapitalization and sole owner taking money from the corporation "as needed" in lieu of a fixed salary).  Natanzon's complete domination of the Corporate Defendants thus clearly satisfies the first element of an alter ego veil piercing claim.

17

To prevail on their veil piercing claim, the Plaintiffs still must demonstrate that they suffered harm as a result of Natanzon's domination of the Corporate Defendants. See Kasper, 952 F. Supp. 2d at 570 (quoting Matter of Morris, 82 N.Y.2d at 141-42) ("While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required."); see also Xiotech Corp. v. Express Data Products Corp., No. 6:13-CV-861 MAD/TWD, 2014 WL 1314279 (N.D.N.Y. Apr. 3, 2014) ("Mere use of the corporate form to avoid personal liability is not improper."); Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc., No. 09-cv-1410 (KAM) (RLM), 2013 WL 1334271, at *16 (E.D.N.Y. Mar. 28, 2013) (recognizing as an "unremarkable proposition," that a defendant's breach of contract alone, "without evidence of fraud or corporate misconduct," is insufficient to pierce the corporate veil"); Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp., 938 F. Supp. 2d 361, 378 (E.D.N.Y. 2013) (piercing the corporate veil when the "undisputed facts" demonstrated that the individual defendant's actions resulted in the corporate defendants' failure to make appropriate payments).

In their opposition papers, the Defendants contend that veil piercing is unwarranted because "no fraud has been established as [a] matter of law." (Defs.' Opp. at 8). In framing the issue this way, the Defendants misinterpret the relevant case law. Contrary to their suggestion, the Plaintiffs are not required to prove fraud, but may satisfy this prong of their alter ego claim through evidence that Natanzon's domination of the

18

corporate defendants resulted in "wrongdoing or some act of injustice."  Kasper, 952 F. Supp. 2d at 578 (emphasis in original).

Although the Plaintiffs devote most of their argument to the issue of domination, (see Pls.' Mem. at 16-23), they also allege in conclusory fashion that they were harmed because Natanzon's actions depleted the Corporate Defendants of assets or future business prospects and thus rendered them unable to honor their financial obligations to the Plaintiffs.  (Id. at 23).  In pressing this argument, the Plaintiffs come close to admitting that the "wrong" they seek to redress is simply the breach of the Security Agreements by the Corporate Defendants.  (See ECF No. 34 ("Pls. Reply") at 9 ("The [Corporate Defendants] no longer have any assets or business and are thus utterly unable to pay for the $1,674,216.90 worth of diamonds that [the] Plaintiffs sold to them.")).  Even if this assertion is treated as an argument that Natanzon wrongfully diverted funds from the Corporate Defendants to make them judgment-proof, the Plaintiffs nevertheless have failed to demonstrate that they are entitled to summary judgment because his conduct harmed them.

"The diversion of funds to make a corporation judgment-proof" does "constitute[] a wrong for the purposes of determining whether the corporate veil should be pierced."  Fed. Nat. Mortgage Ass'n v. Olympia Mortgage Corp., 724 F. Supp. 2d 308, 320 (E.D.N.Y. 2010) (quoting Capital Distribution Servs., Ltd. v. Ducor Express Airlines, Inc., No. 04 CV 5303 (NG) (VVP), 2007 WL 1288046, at *3 (E.D.N.Y. May 1, 2007)); see Weinreich v. Sandhaus, 850 F. Supp. 1169, 1179 (S.D.N.Y. 1994) ("Carrying on a

business without substantial capital and leaving the corporation without substantial assets to meets its debts can justify piercing the corporate veil.").  Here, however, there is an issue of fact as to whether the Plaintiffs were aware that Natanzon was using A&M Diamonds and MM Diamonds as shell companies to allow more credit to be extended by the Plaintiffs, as well as whether he was doing so at their express request.  (See Ariel Decl. ¶ 52; Natanzon Decl. ¶¶ 5-6, 15(A)).  If so, it would be difficult to say that the Plaintiffs were wronged when their joint scheme fell apart.  Similarly, there is an issue of fact as to whether Natanzon acted willfully to divert funds from the Corporate Defendants in order to make them judgment proof.  For example, although Natanzon admits to taking money from M&N Diamond's bank account on an "as needed" basis to cover personal expenses (Natanzon Decl. ¶ 15(C)), it is unclear how much money was withdrawn, or when, and thus what effect, if any, these actions had on the Corporate Defendants' ability to satisfy their debts.

Indeed, as the Defendants correctly observe, while the Corporate Defendants may technically have been undercapitalized, they conducted business with the Plaintiffs successfully for at least three years, during which time millions of dollars in cash and diamonds were sent by them to the Plaintiffs.  (See Natanzon Decl. ¶ 15(E); id. Exs. A-C; Defs.' Opp. at 8); Tycoons, 721 F. Supp. 2d at 206-207 ("[U]ndercapitalization alone is generally insufficient to warrant piercing the corporate veil.").  Moreover, even though Natanzon concedes that he has since commenced doing business through a new corporation – ironically named "New Life Inc." (see Natanzon Dep. at 46-50) – there are

issues of fact as to whether New Life has taken over the Corporate Defendants' business opportunities and whether any assets were wrongfully transferred from the Corporate Defendants to New Life.  (See Ariel Decl. ¶¶ 57-58; Natanzon Decl. ¶ 15(D)).

> In view of these evidentiary issues, it is impossible to determine at this juncture whether Natanzon's payments to himself or his formation of New Life caused the Corporate Defendants not to be able to honor their obligations to the Plaintiffs. Accordingly, the Plaintiffs' motion for partial summary judgment against Natanzon on their veil piercing claim should be denied.

IV.    Conclusion

> For the foregoing reasons, the Plaintiffs' motion for partial summary judgment, (ECF No. 17), should be granted in part and denied in part.

V.    Notice of Procedure for Filing Objections to this Report and Recommendation

> The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan and to my chambers at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Kaplan.  The failure to file these timely objections will result in a waiver of those objections for purposes of

appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(d), 72(b).

       SO ORDERED.

Dated:     New York, New York
           August 20, 2015

                              FRANK MAAS
                   United States Magistrate Judge